244 N.J. Super. 647 (1990)
583 A.2d 384
COUNTY OF ESSEX, A BODY POLITIC CORPORATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM WALDMAN [SUCCESSOR TO ALTMAN], ACTING COMM'R., ETC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 19, 1990.
Decided December 6, 1990.
*650 Before Judges KING and LONG.
H. Curtis Meanor argued the cause for respondent (Harry J. Del Plato, Assistant County Counsel, of counsel; Thomas M. Bachman, Assistant County Counsel, on the brief).
Sharon M. Hallanan, Deputy Attorney General, argued the cause for appellant (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Michael R. Clancy, Assistant Attorney General, of counsel).
John S. Furlong, Mercer County Counsel, filed letter brief on behalf of Amicus, Bill Mathesius (Gail R. Henningsen, Assistant County Counsel, on the letter brief).
The opinion of the court was delivered by KING, P.J.A.D.
This is an appeal by defendants, Commissioner of the Department of Human Services and other State officials within the Department (State), from a summary judgment in the Law Division enjoining the State's long-standing practice of retaining 50% of maintenance payments received in the form of Social *651 Security benefits on behalf of indigent patients with Essex County settlements who reside in State institutions. The Law Division judge ordered the State to disburse 100% of those receipts to the credit of plaintiff Essex County up to the amount of the County's statutory obligation for the maintenance costs for those patients retroactive to January 1, 1980.
We affirm the ruling in favor of the County on the issue of liability. We conclude that the statutory scheme required credit to the County for all Social Security payments made on behalf of patients from Essex County. We further conclude that the judgment should have limited retrospective effect only and bear no prejudgment interest. We thus affirm in part and modify in part.
This is the procedural context. On January 25, 1989 plaintiff Essex County filed a complaint in lieu of prerogative writ alleging that the Commissioner's and State's practice of retaining 50% of the Social Security benefits received by the State as representative payee on behalf of indigent patients with Essex County settlements violated N.J.S.A. 30:4-60. On March 15, 1989 the County moved for summary judgment. On April 4, 1989 the State cross-moved for summary judgment. On March 30, 1989, pending the return date of its motion for summary judgment, the County moved for leave to file an amended complaint. The parties then entered into a consent order in which the County was permitted to file a separate action to encompass the issues it sought to raise in its proposed amended complaint. That action now has been litigated and decided separately.[1]
On April 14, 1989 the Law Division judge heard oral argument on the motion and cross-motion for summary judgment and decided in favor of the County. The judge then ordered that the State provide the County with an accounting of all *652 monies owed to the County as a result of his ruling. An accounting was filed in the form of an affidavit of the State's Chief of the Bureau of Financial Standards and Procedures, Office of Finance and Accounting, Department of Human Services, along with supporting documentation. Without objection to the State's accounting methods, the judge then entered an order fixing the amount of the State's liability at $10,636,545. which included prejudgment interest. This appeal followed.
In question here is the distribution of Social Security benefits received by the State as representative payee on behalf of county indigent patients with settlements in Essex County. The relevant statutes in Title 30 governing State institutions and agencies contain no precise directives on how the State as representative payee must apply these funds. In the absence of a specific mandate the State has since 1955 conducted a policy of keeping one-half of the Social Security benefits it receives as representative payee for all the county indigent patients with settlements in the State and crediting the other one-half to the counties' obligations for the patients. While under no precise statutory duty either to retain these sums or to pay any part of these recoveries to the counties, the State has justified this procedure as an effort to further its understanding of the policy behind N.J.S.A. 30:4-78: that the State and counties share the costs of patient maintenance on a "fifty-fifty" basis.[2]
*653 Essex County challenged the State's policy of retaining 50% of the Social Security recoveries it has received over at least the past 35 years on behalf of county indigent patients with Essex County settlements. The County claimed that since N.J.S.A. 30:4-60 permits counties to recover payment from the patient or legally responsible relatives up to the County's one-half share of the patient's total maintenance costs, the County is entitled to receive all of the Social Security benefits paid to the patient up to its 50% obligatory share of those costs. The County requested a ruling of the Law Division permanently enjoining the State from retaining any part of the Social Security recoveries and directing the State to reimburse to the County all such benefits wrongfully retained by the State since January 1, 1980 plus prejudgment interest.
The State maintains that the County's entitlement to credit for funds on behalf of the patient should be limited under N.J.S.A. 30:4-60 to these amounts received by the Essex County treasurer directly from the patient or family. In the absence of any explicit statutory duty concerning distribution of the Social Security benefits received by the State on behalf of County patients, the State claims that it is entitled to split these benefits with the County 50/50. The State also asserts that the Law Division had no jurisdiction to entertain the subject matter of this dispute and that the County's claims were barred by contravening considerations of public policy, sovereign immunity, estoppel, waiver and laches.
The judge noted in his oral opinion in the County's favor that N.J.S.A. 30:4-60 clearly provides that all money received from county indigent patients or the persons responsible for their support is to be "applied first to reduce the amount chargeable to the county of legal settlement for its per capita cost of maintenance." He observed that while N.J.S.A. 30:4-60, when *654 read together with N.J.S.A. 30:4-78, requires that the State and the County share the cost of maintaining county indigent patients, § 60 does not
even remotely imply that any maintenance monies recovered on behalf of a mentally ill patient must be divided equally between the County and the State to defray the cost of maintenance. Had this been the case, surely the Legislature would not have permitted excess recoveries to be paid to the Institution. Instead, the excess payment would have been credited to the State.
In his oral opinion the judge referred to the Program Analysis of Institutional Maintenance Support Payments (1974) issued by the State Legislative Office of Fiscal Affairs (I Program Analysis). He quoted that portion of the Program Analysis which states:
A patient is given a County indigent classification by the County Court if he has legal settlement within the County and if he (or his family) do not have sufficient income to meet the county portion of the maintenance support charges. Based on the application of the Treasury formula for determining ability to pay, the patient or his family are required to make whatever contributions their income would indicate. Those contributions go entirely to the County and are not shared with the State. [I Program Analysis at 15 (emphasis supplied)].
The judge also cited a passage from the Supervisor of Patient's Accounts Procedures Manual (1985  revised 1987) (SPAM), which instructs that in the case of a patient who is financially able to pay the costs of maintenance, the county of legal settlement bills the patient and then retains all receipts. The judge concluded,
Applying N.J.S.A. 30:4-60 and N.J.S.A. 30:4-78 to the facts before the Court, and with proper consideration being given to the Program Analysis and SPAM, it must follow and the Court finds that 50% of the maintenance recoveries obtained by the State for indigent patients in State Institutions were wrongfully retained by the State. Specifically, where the State was named Representative Payee of Social Security benefits of indigent County patients, 50% of said funds were improperly held by the State to reduce 50% of its per capita costs.
Now, 100% of the Social Security payments, no matter to whom they were paid, the State Agency or nominee or whoever it may be, should have been recaptured by the County as a credit toward the County's per capita share, with any excess amount being forwarded to the Institution.
As noted, the judge awarded a judgment of $10,636,545 representing the sum of Social Security recoveries withheld since *655 January 1, 1980. The sum awarded included prejudgment interest.

I
We agree with the Law Division judge that the statutory scheme supports the County's contention. Chapter Four of Title 30, which governs the management, control and operation of State institutions, provides a system of public assistance to mentally ill and developmentally disabled individuals who are unable, and whose legally responsible relatives are unable, to afford the full costs of institutional care. See N.J.S.A. 30:4-24(7) (public policy of the State requires that facilities be available to all persons without limitation because of economic circumstances). The cost of maintaining any indigent patient in a State institution is divided evenly between the State and the county where the patient has a legal settlement. N.J.S.A. 30:4-78. If the committing judge determines, through application of the Treasury Department's formula of financial ability to pay, that a patient with a county settlement or legally responsible relatives are able to pay a sum equal to or in excess of the one-half share chargeable to the county, the judge will order the responsible party to pay that amount monthly. N.J.S.A. 30:4-60. If the amount contributed on behalf of the patient exceeds the obligation attributed to the patient's county of legal settlement, "no order shall be entered against the county of legal settlement for any part of such maintenance." N.J.S.A. 30:4-60. The State alone then pays the remainder, if any.[3] When an indigent patient has no legal settlement in any *656 county, the entire cost of maintenance is borne by the State. N.J.S.A. 30:4-69.
In construing a statute, our duty is to determine the intent of the Legislature. AMN, Inc. v. So. Bruns. Tp. Rent Leveling Bd., 93 N.J. 518, 525, 461 A.2d 1138 (1983). To discern legislative intent, we must consider among other things the language of the statute, the nature of the subject matter, the contextual setting, the policy behind the statute, statutes in pari materia, and concepts of reasonableness. State v. Wright, 107 N.J. 488, 502, 527 A.2d 379 (1987); Shapiro v. Essex County Freeholder Board, 177 N.J. Super. 87, 93, 424 A.2d 1203 (Law Div. 1980), aff'd 183 N.J. Super. 24, 443 A.2d 219 (App.Div. 1982), aff'd 91 N.J. 430, 453 A.2d 158 (1982). Where it is apparent that the drafters of a statute did not contemplate a specific situation, in this case the disposition of Social Security recoveries received on behalf of county indigent patients, we must interpret the statute "consonant with the probable intent of the draftsman `had he anticipated the situation at hand.'" J.C. Chap. Prop. Owner's etc. Assoc. v. City Council, 55 N.J. 86, 101, 259 A.2d 698 (1969), quoting Dvorkin v. Dover Tp., 29 N.J. 303, 315, 148 A.2d 793 (1959); Amerada Hess Corp. v. Div. of Tax, 107 N.J. 307, 318-319, 526 A.2d 1029 (1987), aff'd 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989); Safeway Trails, Inc. v. Furman, 41 N.J. 467, 477, 197 A.2d 366 appeal dismissed and cert. den., 379 U.S. 14, 85 S.Ct. 144, 13 L.Ed.2d 84 *657 (1964); 2A Sutherland, Statutory Construction § 49.02 at 348 (4th ed. Sands 1984).
The specific statute which governs payments of maintenance costs by the patient or legally responsible relatives, N.J.S.A. 30:4-60, provides in pertinent part:
If the court shall determine that the patient is mentally ill and ... that the patient has sufficient estate to pay for his maintenance ... or is able to pay a sum in excess of that chargeable to the county of legal settlement, if any, or if the person or persons legally liable for his support . .. are able to pay such amount of maintenance ... the court, after determining the legal settlement of such patient may, in its discretion, commit or direct the admission or hospitalization of such patient to any State, county, or private mental hospital in this State. In the final judgment of commitment or order directing admission or hospitalization it shall direct that the cost of the care and maintenance of such patient in the institution designated in the judgment ... shall be paid out of the estate of the patient or by the person chargeable by law with his support, or by contract, as the case may be, and the judgment shall specify the amount of maintenance as fixed from time to time for such institution, which shall be paid thereunder, and shall, in the discretion of the court, contain such direction as may seem proper concerning security to be given for such payment. As long as the amount contributed by the patient's estate or his legally responsible relatives for the maintenance of the patient exceeds the amount chargeable as fixed pursuant to section 30:4-78 of this Title, no order shall be entered against the county of legal settlement for any part of such maintenance. [Emphasis supplied.]
This portion of the statute directs that the patient or responsible relatives are liable for the costs of the patient's maintenance where the court determines that they have sufficient financial resources. The patient's county of legal settlement is not liable for any part of the patient's maintenance costs so long as the amount received from "the patient's estate or his legally responsible relatives" exceeds 50% of the entire cost of care as provided in N.J.S.A. 30:4-78. To us, the language of N.J.S.A. 30:4-60 clearly manifests a legislative intention that that share of a patient's maintenance costs not covered by the State be paid for with funds supplied primarily by the patient's estate and secondarily by the patient's legally-responsible relatives, if such funds are available. Only where those two sources are insufficient is the patient's county of legal settlement *658 responsible for the patient's maintenance costs, as provided in the second paragraph of N.J.S.A. 30:4-60:
If on final hearing a patient and his chargeable relatives are found unable to pay an amount for maintenance in excess of the amount chargeable to the county of legal settlement, the court shall direct that such patient be committed to the institution as a patient chargeable to the county of legal settlement ... as provided in this article, and on reasonable notice to the persons to be charged, may further direct that such patient or his or her chargeable relatives, or any of them, pay monthly . .. to the county treasurer of the county chargeable in the case of county patients, such part of the cost of the maintenance of such patient as the court may direct in the manner provided herein. If such county treasurer shall actually receive from such patient, or his or her chargeable relatives, as aforesaid any money in excess of that paid by the county in support of such patient, he shall pay such excess to the institution in which such patient is confined, for the use of such institution. [Emphasis supplied.]
Where the patient or responsible relatives can pay some, but not all, of the share not covered by the State, they must pay those funds directly to the County. Only when that share of the obligation is satisfied does the County forward the excess received on behalf of the patient directly to the institution.
Most assuredly, the Act does not define the term "patient's estate." But by any sensible understanding Social Security benefits are the assets of the individual entitled to them, in this case the county indigent patient, and thus part of the patient's estate. We conclude that under N.J.S.A. 30:4-60, if a county-indigent patient receives Social Security benefits through a representative payee,[4] those funds should first be paid over or credited to the county which then pays or credits the State the county's proper share of the patient's maintenance. The circumstance that benefits are received by a representative payee on behalf of the patient does not alter the fact that ultimately those monies are the property of the patient. The State is a mere conduit. Where the State acts as representative payee, it is obligated in its fiduciary duty to the *659 patient to forward, in effect, the benefits to the patient who then pays the County pursuant to N.J.S.A. 30:4-60. The State's retention of any part of those funds, which in turn prevents the County from recovering up to its share of the patient's maintenance costs, violates the intention of the statute.
We reject the State's expressio unius argument. The State relies on the clause in the second paragraph of N.J.S.A. 30:4-60 which provides:

If such county treasurer shall actually receive from such patient, or his or her chargeable relatives, as aforesaid any money in excess of that paid by the county in support of such patient, he shall pay such excess to the institution in which the patient is confined, for the use of such institution. [Emphasis supplied.]
The State contends that by limiting this directive to those funds that the "county treasurer shall actually receive," the Legislature intended to exclude all other patients' receipts, such as these Social Security benefits received by the State as representative payee, from the money which the County would otherwise receive.
This reliance on the expressio unius maxim is misplaced. The stressed clause in N.J.S.A. 30:4-60 to which the State alludes does not define the limits of the county's power to retain funds for the patient's maintenance. Rather, that passage deals with the disposition of funds received by the county from the patient or family that are in excess of the county's share of that patient's medical and maintenance costs. The State's contention that the Legislature's specific reference to those funds actually received by the county treasurer somehow excludes from the estates of county indigent patients, and therefore from the coffers of the county of entitlement, social security benefits received by the State as representative payee, is unpersuasive. We conclude that the construction principle of probable legislative intent controls here and achieves a more sensible result than the expressio unius maxim.
*660 The State also contends that the trial judge's ruling requiring it to turn over or credit to the County 100% of the Social Security recoveries it receives failed to give due regard to what it claims is the fundamental purpose of N.J.S.A. 30:4-60, "that the State and counties share in the costs of maintaining indigent residents at the State's psychiatric hospitals and developmental centers." To that end, according to the State, "it is appropriate for the State and county of settlement to evenly divide any recoveries received by the State which can be used toward an indigent's maintenance, where the statutes do not directly address those recoveries."
The State points to no authority for this purported legislative purpose allegedly behind the statute. Its claim that the Legislature considered of paramount importance that the State and counties bear an equal burden in the maintenance of indigent patients is belied by the actual language of N.J.S.A. 30:4-60 and by cognate provisions in the Act. These provisions reveal a legislative intent that the State bear ultimate financial responsibility in caring for indigent patients and that the counties contribute to their own patients' costs only where those patients or their families cannot afford to do so. N.J.S.A. 30:4-60 provides that the State assumes responsibility for that portion of the cost of maintenance for all indigent patients without county settlement which the patients and their relatives cannot pay, as well as up to one-half of the cost of maintenance for indigent patients with county settlement. The counties, on the other hand, are required to pay only that portion of their one-half share of the cost of maintenance for county dependent patients which the patients and their relatives cannot pay. In addition, N.J.S.A. 30:4-68.1, L. 1980, c. 8, § 1, which governs the distribution of Medicaid and Medicare benefits, provides, in pertinent part:
In the case of Medicaid and Medicare eligible patients, the maintenance costs to be paid by the counties shall be satisfied by Federal Medicaid or Medicare payments to the State. Should a State hospital for the mentally ill lose its accreditation and subsequently not receive Federal Medicaid and Medicare *661 payments, the counties shall not be liable for the maintenance of Medicaid or Medicare eligible county patients.
In directing that the county's share of an eligible indigent patient's maintenance costs be satisfied by Medicaid and Medicare payments, the Legislature in 1980 reinforced its longstanding, expressed general intention that the State bear ultimate responsibility for the care of indigent mentally ill patients. N.J.S.A. 30:4-68.1 is particularly significant with regard to the issue here because it serves as a further indication that health benefits received by patients from outside sources such as Social Security should be treated as the patient's own assets, not a federal gratuity to the State, and should be applied first to satisfy the county's share of the financial burden of maintaining a county's indigent mentally ill patients in State institutions.
The State also contends that the judge should have given great deference to the administrative decision of the Department of Human Services to retain 50% of all Social Security benefits received by the State as representative payee, because that policy has been in effect since 1955 and has been unaltered by subsequent legislation. While we typically give due deference to interpretations of a statute made by the enforcing agency, Mortg. Bankers Ass'n v. N.J. Real Estate Comm'n, 102 N.J. 176, 188, 506 A.2d 733 (1986), we are not bound by that interpretation or by the agency's determination on a strictly legal issue. Fedders Financial Corp. v. Taxation Div. Dir., 96 N.J. 376, 392, 476 A.2d 741 (1984). In fact, we are "bound to override an administrative construction where it is clearly contrary to the plain meaning of the statute." Service Armament Co. v. Hyland, 70 N.J. 550, 562, 362 A.2d 13 (1976). Here, the Department's interpretation of N.J.S.A. 30:4-60, allowing the State to retain Social Security benefits, was clearly contrary to the plain meaning and probable intent of the statute. It is not entitled to persuasive deference.
Finally, the State contends that the Law Division judge erred in giving undue weight to the Program Analysis of Institutional *662 Maintenance Support Payments (Program Analysis) and Supervisor of Patient's Accounts Manual (SPAM), since those publications are not binding authority in this context. We tend to agree with the State on this point but since the judge's determination was correct and fully supportable without reference to those publications the State's observation is inconclusive and cannot alter the result. R. 2:10-2.

II
We conclude that the decision and order of the Law Division should be given limited retroactive effect only, that is, from the date of filing the complaint, January 25, 1989. The judgment of the Law Division gave the ruling retroactive effect to January 1, 1980, as demanded in the complaint. This resulted in a refund of $8,145,145 plus $2,491,400 in prejudgment interest as of the date of judgment, June 28, 1989.
The State contends that the judge erred in failing to apply the appropriate balancing test to the retroactivity aspect. We agree. Generally, judicial decisions are applied fully retroactively. Such retroactivity questions are "among the most difficult problems that engage the attention of courts." N.J. El. Law Enf. Comm'n v. Citizens to Make Mayor Council Government Work, 107 N.J. 380, 387, 526 A.2d 1069 (1987); Coons v. American Honda Motor Co., 96 N.J. 419, 424-425, 476 A.2d 763 (1984) (Coons II). Our courts sometimes do accord their rulings "prospective effect in cases where the interests of justice mandate such an approach." N.J. El. Law Enf. Comm'n, 107 N.J. at 387, 526 A.2d 1069.
In deciding whether a ruling will receive retroactive effect or be restricted to future and pending cases, our courts have adopted an equitable balancing test developed by the federal Supreme Court which focuses on three considerations:
First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, * * * or by deciding an issue of first impression whose resolution was *663 not clearly foreshadowed * * *. Second, it has been stressed that "we must * * * weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." * * * Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is simple basis in our cases for avoiding the `injustice or hardship' by a holding of nonretroactivity." [Coons II, 96 N.J. at 427, 476 A.2d 763 (quoting Chevron Oil Co. v. Huson, 404 U.S. 97, 106-107, 92 S.Ct. 349, 355, 30 L.Ed.2d 296, 306 (1971).]
In support of its contention, the State relies on Salorio v. Glaser, 93 N.J. 447, 461 A.2d 1100 (1983), where plaintiffs who successfully challenged an emergency transportation tax were not entitled to retroactive reimbursement of taxes already paid, and Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (Lemon I), where the Court ruled that nonpublic sectarian schools were entitled to reimbursement for services rendered before the statute providing for such reimbursement was held unconstitutional. Alternatively, the State urges a bar to recovery for past retention of Social Security payments by application of the equitable doctrine of laches, citing Lavin v. Hackensack Bd. of Ed., 90 N.J. 145, 447 A.2d 516 (1972).
The Law Division opinion in reality had the effect of establishing a new principle of law by deciding a statutory interpretation issue of first impression, the resolution of which was not clearly foreshadowed by past decisions or administrative practices. See Coons II, 96 N.J. at 427, 476 A.2d 763. No court had previously considered whether the State's practice of retaining patients' Social Security benefits in preference to the County was contrary to N.J.S.A. 30:4-60. The case truly was "`one of first impression' that resolved a previously undetermined issue of statutory construction." N.J. El. Law Enf. Comm'n, 107 N.J. at 390, 526 A.2d 1069. Though there may be no clear break with the past in the theoretical sense because the statutes we construe were always on the books, our construction of these statutes, affirming the conclusion reached by the Law Division, compels a clear break with 35 years of past administrative *664 practices. The change was every bit as radical as a clear break with past legal precedent. The long delay in mounting the challenge to the State's practice, probably due to lack of imagination or to uncertainty about its validity, is an element we cannot eschew in the equitable equation.
Another aspect of concern is the purpose and effect of complete retroactive application. A fully retroactive affirmance going back ten years would cost the State well in excess of the $10 million plus ordered here. We were told at oral argument that five other counties[5] now are seeking retroactive recovery under the Law Division's ruling. Since the State bears the primary responsibility for the maintenance of these indigent patients, the State's potential liability to all 21 counties for retention of a decade's Social Security payments to the extent of 50% could substantially impact current Division budget considerations relating to the present and ongoing care of those patients or disrupt current State tax policies.
Reliance by the State on an ongoing fiscal scheme deserves considerable consideration in the equitable formula. This was deemed very significant in Salorio v. Glaser, 93 N.J. at 465-467, 461 A.2d 1100. Reliance here by the State on an unchallenged, longstanding administrative policy may not be quite as justified as reliance on a presumptively valid, unchallenged statute. Nevertheless, the legitimate fiscal impact is the same whether the reliance is placed on a statute or on a time-honored administrative procedure. The Court in Salorio said:
The legislative and the executive branches of government have relied on the ETT [Emergency Transportation Tax] for many years in preparation of budgets, with respect to both income and expenditures, and in making appropriations and expenditures. The expenditures cannot be undone and reimbursement would have a substantial effect on the State's existing financial requirements. Public Fiscal stability is at issue.
* * * * * * * *

*665 The State has anticipated and collected ETT revenues for more than twenty years. At present those revenues exceed $30,000,000 per year. They are an established part of New Jersey's budget and are related to expenditures used for the public welfare, including transportation projects that benefit New York residents such as the plaintiffs. Elimination of this source of revenue will require a reduction in expenditures, or an increase in alternative revenues, or creation of new taxes, or some combination of the foregoing. [93 N.J. at 465, 467, 461 A.2d 1100.]
In fairness to the State, what the County today claims is so clear and compels adoption of its view of the proper judicial construction of the statutes was just as clear over three decades ago. Moreover, today's taxpayers in Essex County who would benefit by a retroactive ruling are not necessarily the same people who have suffered the detriment over the past 35 years from the misguided administrative practice.
For these reasons, we conclude that the traditional rule of full retroactivity should not obtain here. The words of Judge Conford, presaging the Chevron and Lemon II [411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151] view and quoted with approval in Coons II, 96 N.J. at 428-429, 476 A.2d 763, seem to apply:
There is no question but that appellate courts in this State and elsewhere have long regarded themselves as empowered and justified in confining the effect of a decision of first impression or of novel or unexpected impact to prospective application if considerations of fairness and justice, related to reasonable surprise and prejudice to those affected, seemed to call for such treatment. 104 N.J. Super. at 520 [250 A.2d 593]. [Oxford Consumer Discount Co. v. Stefanelli, 104 N.J. Super. 512, 520, 250 A.2d 593 (App.Div. 1969), modified, 55 N.J. 489, 262 A.2d 874 appeal dismissed, 400 U.S. 923, 91 S.Ct. 183, 27 L.Ed.2d 182 (1970).]
We conclude that limited retrospective application to the date of filing the complaint, January 25, 1989, is the fairest result here. The filing of suit was an event sufficient to alert the State to order its fiscal affairs in the eventuality of an adverse ruling, a consequence that quickly followed in June 1989. We see no injustice in a limited retroactive result favorable to this plaintiff only and certain benefits in this resolution. Moreover, our ruling provides a more realistic incentive to the ultimately prevailing party in this case to pursue litigation in the interest of its taxpayers than would a completely prospective ruling *666 only. See Stovall v. Denno, 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199, 1206 (1967).
Equitable remedies should be adopted so as to fit the circumstances of each case and the complex relationship of all the parties. Sears, Roebuck & Co. v. Camp, 124 N.J. Eq. 403, 411-412, 1 A.2d 425 (E. & A. 1938), citing 1 Pomeroy, Equity Jurisprudence, § 109 at 122-123 (4th ed. 1918); see Salorio v. Glaser, 93 N.J. at 469, 461 A.2d 1100; Hays v. Regents of the Univ. of Michigan, 393 Mich. 756, 223 N.W.2d 276 (1974) (relief retrospective to commencement of suit only), cited with approval in Salorio, 93 N.J. at 466-467, 461 A.2d 1100. Principles of equity compel us to declare the administrative practice valid for indeterminate transactions up to the time of the filing of the complaint. See Great Northern R. Co. v. Sunburst Oil, 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360, 366 (1932). We see nothing in the recent cases relied upon by the County, i.e., McKesson v. Div. of Alcoholic Beverages & Tobacco, 495 U.S. ___, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990); Ashland Oil, Inc. v. Caryl, 497 U.S. ___, 110 S.Ct. 3202, 111 L.Ed.2d 734 (1990); American Trucking Association v. Smith, 495 U.S. ___, 110 S.Ct. 2323, 110 L.Ed.2d 148 (1990), which constitutionally compel a different result. There was no duress or compulsion exercised here. The State's policy could have been challenged at any time. Our limited retrospective holding fairly accommodates any federal constitutional requirement of "backward looking relief," McKesson, 495 U.S. at ___, 110 S.Ct. at 2247, 110 L.Ed.2d at 32, assuming this consideration applies to disputes between the State and its political subdivisions.

III
As to the award of prejudgment interest, obviously substantially mooted by our holding on limited retroactivity, we modify to allow prejudgment interest from the date of filing the complaint. The decision to grant or deny pre-prejudgment interest rests in sound discretion, Meshinsky v. Nichols Yacht *667 Sales, 110 N.J. 464, 478, 541 A.2d 1063 (1988); it is made consistently with equitable principles. Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 131, 351 A.2d 349 (1976). We usually will defer to the trial judge's exercise of discretion unless it represents a manifest denial of justice. A.J. Tenwood A. v. Orange Sr. Cit. Housing, 200 N.J. Super. 515, 525, 491 A.2d 1280 (App.Div. 1985). The equitable purpose of awarding prejudgment interest is compensatory, "to indemnify the claimant for the loss of what the moneys due him would presumably have earned if the payment had not been delayed." Busik v. Levine, 63 N.J. 351, 358, 307 A.2d 571 (1973); Ellmex Const. Co. Inc. v. Republic Ins. Co., 202 N.J. Super. 195, 212-213, 494 A.2d 339 (App.Div. 1985). However, "[w]here the debtor is a governmental agency and interest in the cause is not provided for by statute, particular circumspection in the granting of prejudgment interest is required and a showing of overriding and compelling equitable reasons must be made in order to justify the award." Bd. of Educ., City of Newark, Essex Cty. v. Levitt, 197 N.J. Super. 239, 244, 484 A.2d 723 (App.Div. 1984); see also Klein v. Hudson County, 187 N.J. Super. 603, 620, 455 A.2d 583 (Law Div. 1980), aff'd 187 N.J. Super. 433, 433, 455 A.2d 491 (App.Div. 1982), certif. den. 91 N.J. 533, 453 A.2d 855 (1982). Here both debtor and creditor are governmental agencies.
We find no abuse of discretion in the award of prejudgment interest in the Law Division but modify the judgment to conform to II above.

IV
The State's final contention, that this action should have been brought directly in this Division pursuant to R. 2:2-3(a)(2) because it sought review of the final decision of a State administrative agency, is effectively mooted by our decision today. See R. 1:13-4(a); Johnson v. N.J. State Parole Bd., 131 *668 N.J. Super. 513, 520, 330 A.2d 616 (App.Div. 1974), certif. den. 67 N.J. 94, 335 A.2d 47 (1975).
The matter is remanded to the Law Division for entry of an order consistent with this opinion.
NOTES
[1] See County of Essex v. Comm'r, Dept. of Human Services, et al., Docket No. L-6978-89 (filed April 27, 1989).
[2] The Commissioner of Human Services has the general authority "to determine all matters relating to the unified and continuous development of the institutions and noninstitutional agencies within his jurisdiction." N.J.S.A. 30:1-12. Within the Commissioner's jurisdiction are two major types of institutions, "psychiatric hospitals" and "developmental centers." Psychiatric hospitals, also known as "State hospitals for the mentally ill," "mental hospitals" and "psychiatric facilities," serve persons with mental illness as defined in N.J.S.A. 30:4-27.2r. See N.J.S.A. 30:1-7; N.J.S.A. 30:4-23 (repealed by L. 1987, c. 116, § 30). "Developmental centers" are residential institutions for persons with developmental disabilities as defined in N.J.S.A. 30:6D-25b. These patients previously were called "mentally retarded." Although the statutory scheme technically applies only to the institutions for the mentally ill, the State has treated the institutions for the developmentally disabled on the same 50/50 basis. The ruling in the Law Division applied to both types of institutions.
[3] Both parties have advised us by supplemental briefing of new legislation addressed to the issues before us. L. 1990, c. 73 amends both N.J.S.A. 30:4-60 and N.J.S.A. 30:4-78. The amendments are effective on July 1, 1991. Section 4 of L. 1990, c. 73, provides that if the State receives federal social security benefits for a patient in a psychiatric facility, "the State shall credit the funds to the county of settlement" but the credit shall not "exceed the county's share of maintenance and clothing costs for the patient." Thus the county comes first as to psychiatric facilities under the new legislation. Under L. 1990, c. 66, § 2, effective date July 1, 1991, all county responsibility for costs for developmentally disabled ceases. Thus as to both the mentally ill and developmentally disabled, the issue before us is moot after July 1, 1991.

Each side urges us that the amendments support their respective contentions as to how the statutes should be construed in this law suit. We reject both entreaties. See 2A Sutherland, Statutory Construction § 49.11 at 414 (4th ed. Sands 1984) (discusses conflicting maxims used in the cases). The amendments were part of an overall revamping of tax policies to allow fiscal relief to the counties. See L. 1990, c. 39 to c. 42, enacted June 27, 1990. Our focus here is on the probable legislative intent expressed in the statutes "on the books" at the time of this controversy.
[4] Under the relevant federal regulations, counties do not act as representative payees for patients in our State institutions, 20 CFR § 404.2001; 20 CFR § 416.601.
[5] Hunterdon, Morris, Middlesex, Monmouth and Passaic.