661 A.2d 842

NEW JERSEY HOSPITAL ASSOCIATION, A NEW JERSEY NON-PROFIT CORPORATION, ON BEHALF OF ITS MEMBERS, AND, INDIVIDUALLY, ATLANTIC CITY MEDICAL CENTER, BAYONNE HOSPITAL, BAYSHORE COMMUNITY HOSPITAL, BERGEN PINES COUNTY HOSPITAL, BURDETTE TOMLIN MEMORIAL HOSPITAL, CENTRASTATE MEDICAL CENTER,

CHRIST HOSPITAL, COLUMBUS HOSPITAL, COMMUNITY MEDICAL CENTER, DEBORAH HEART & LUNG CENTER, EAST ORANGE GENERAL HOSPITAL, ELMER COMMUNITY HOSPITAL, ENGLEWOOD HOSPITAL AND MEDICAL CENTER, GENERAL HOSPITAL CENTER AT PASSAIC, GRADUATE HEALTH SYSTEM, INC., HACKETTSTOWN COMMUNITY HOSPITAL, HOLY NAME HOSPITAL, HUNTERDON MEDICAL CENTER, IRVINGTON GENERAL HOSPITAL, JOHN F. KENNEDY MEDICAL CENTER, KENNEDY MEMORIAL HOSPITAL–UNIVERSITY MEDICAL CENTER, MEADOWLANDS HOSPITAL MEDICAL CENTER, MEDICAL CENTER AT PRINCETON, MEMORIAL HOSPITAL OF BURLINGTON COUNTY, MEMORIAL HOSPITAL OF SALEM COUNTY, MERCER MEDICAL CENTER, MONMOUTH MEDICAL CENTER, MONTCLAIR COMMUNITY HOSPITAL, MORRISTOWN MEMORIAL HOSPITAL, MOUNTAINSIDE HOSPITAL, MUHLENBERG REGIONAL MEDICAL CENTER, NEWARK BETH ISRAEL MEDICAL CENTER, NEWTON MEMORIAL HOSPITAL, OUR LADY OF LOURDES MEDICAL CENTER, OVERLOOK HOSPITAL, PASCACK VALLEY HOSPITAL, RAHWAY HOSPITAL, RARITAN BAY MEDICAL CENTER, ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL AT HAMILTON, SADDLE BROOK HOSPITAL, SAINT BARNABAS MEDICAL CENTER, SHORE MEMORIAL HOSPITAL, SOMERSET MEDICAL CENTER, SOUTH AMBOY MEMORIAL HOSPITAL, SOUTH JERSEY HOSPITAL SYSTEM, SOUTHERN OCEAN COUNTY HOSPITAL, ST. CLARE'S–RIVERSIDE MEDICAL CENTER, ST. ELIZABETH HOSPITAL, ST. MARY'S HOSPITAL, ST. PETER'S MEDICAL CENTER, UNDERWOOD–MEMORIAL HOSPITAL, UNION HOSPITAL, VALLEY HOSPITAL, WALLKILL VALLEY GENERAL HOSPITAL, WAYNE GENERAL HOSPITAL, WEST JERSEY HEALTH SYSTEM, AND WILLIAM B. KESSLER MEMORIAL HOSPITAL, AND, INDIVIDUALLY, BETH ISRAEL HOSPITAL, COOPER HOSPITAL/UNIVERSITY MEDICAL CENTER, FRANCISCAN HEALTH SYSTEM OF NEW JERSEY, GREENVILLE HOSPITAL, HACKENSACK MEDICAL CENTER, HELENE FULD MEDICAL CENTER, HOSPITAL CENTER AT ORANGE, JERSEY CITY MEDICAL CENTER, JERSEY SHORE MEDICAL CENTER, AND ROBERT WOOD JOHNSON UNIVERSITY HOSPITAL, NEW JERSEY NON–PROFIT CORPORATIONS, PLAINTIFFS–APPELLANTS, v. LEONARD FISHMAN, ACTING COMMISSIONER OF HEALTH, STATE OF NEW JERSEY, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued March 28, 1995—Decided August 1, 1995.

256

Before Judges MICHELS, STERN and KEEFE.

*Ivan J. Punchatz* argued the cause for appellants (*Cohen, Shapiro, Polisher, Shiekman & Cohen,* attorneys; *Mr. Punchatz,* of counsel; *Mr. Punchatz* and *Robynn L. VanPatten,* on the brief).

*Benjamin Clarke,* Assistant Attorney General of New Jersey, argued the cause for respondent (*Deborah T. Poritz,* Attorney General of New Jersey, attorney; *Mr. Clarke,* of counsel; *Mr. Clarke* and *Donald M. Palombi,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Plaintiff New Jersey Hospital Association (the Association) and the sixty-seven plaintiff New Jersey hospitals which it represents, seek a refund of approximately $20 million in tax assessments which the hospitals paid to the State of New Jersey's now defunct Health Care Cost Reduction Fund (HCCR Fund) between August 1992 and April 1993.

The Association is a voluntary not-for-profit corporation which represents the interests of its member hospitals by obtaining and disseminating information about issues of common interest to its members and acting on its membership's behalf. In this matter, the Association is representing the interests of fifty-seven member and ten non-member not-for-profit corporations which operate or operated acute care hospitals within New Jersey during the period from August 1991 through April 1993. These hospitals provided services for the diagnosis and treatment of human disease and pain and injury as defined under *N.J.S.A.* 26:2H–2(a).

On July 1, 1991, the New Jersey Legislature enacted the Health Care Cost Reduction Act (HCCR Act), *N.J.S.A.* 26:2H–18.24 to *N.J.S.A.* 26:2H–18.50. The HCCR Act required all New Jersey acute care hospitals, including plaintiffs, to pay monthly install-

ments of an assessment equalling .53 percent of their 1991 approved revenue bases into the HCCR Fund. The HCCR Act provided that each hospital:

> ... shall make monthly payments to the department for a period of 24 months beginning on the first month following the date of enactment of this act . The commissioner shall determine the manner in which the payments shall be made.
>
> [*N.J.S.A.* 26:2H–18.47b.]

Defendant Leonard Fishman was Commissioner of the New Jersey Department of Health, the State agency that was responsible for the assessment and collection of the .53 percent assessment imposed by *N.J.S.A.* 26:2H–18.47. The Commissioner calculated each hospital's monthly assessment by multiplying the approved revenue amount by .0053 and dividing the product by twelve. By letters dated August 14, 1991, the Commissioner notified each New Jersey acute care general hospital of its monthly obligation to make .53 percent assessments under *N.J.S.A.* 26:2H–18.47.

On September 24, 1991, sixteen hospitals (the *Barnert* appellants) filed an appeal with this court, challenging the constitutionality of the .53 percent assessment as well as the validity of the Commissioner's calculations of the .53 percent assessments. On April 30, 1993, in an unpublished opinion in *Barnert Memorial Hospital v. Dunston,* (Docket No. A–541–91T2, April 30, 1993), *certif. denied,* 134 *N.J.* 482, 634 *A.2d* 528 (1993), we upheld the constitutionality of *N.J.S.A.* 26:2H–18.47 and the Commissioner's interpretation of the statutory language pertaining to the revenue amount on which the .53 percent assessment was to be based, but reversed as to the Commissioner's extension of the .53 percent monthly assessment beyond one year. We held that by August 1992, the Commissioner had collected and deposited into the HCCR Fund the entire gross revenue assessment permitted to be collected from the *Barnert* appellants pursuant to the plain terms of *N.J.S.A.* 26:2H–18.47, and as a result, the Commissioner had overcollected the assessments from August 1992 through April 1993. In sum, we held that the Commissioner had collected the full .53 percent assessment within the first twelve months.

On April 30, 1993, following the *Barnert* decision, the Commissioner ceased further collection from all hospitals. Nevertheless, the Commissioner continued to accept payments from four hospitals through June 1993. Subsequently, in the spring of 1994, the *Barnert* appellants received refunds of the amounts mistakenly collected between August 1992 through April 1993.

The plaintiffs in this matter were not parties in the original *Barnert* appeal. They paid their .53 percent assessments from August 1991 through April 1993, and did not dispute the constitutionality or validity of the assessment nor defendant's collection of the assessments during that time. Plaintiffs now object, however, to the Commissioner's overcollection of the .53 percent assessment for the nine-month period (August 1992 through April 1993) determined to be excessive by the court in *Barnert*, and the Commissioner's refusal to refund the amounts overcollected.

On June 24, 1993, plaintiff Deborah Heart & Lung Center's attorneys, Messrs. Cohen, Shapiro, Polisher, Shiekman & Cohen, sent a letter to the Commissioner demanding a refund of the .53 percent assessments it paid for the nine-month period from August 1992 through April 1993. To date, the Commissioner has not responded to this letter.

On April 13, 1994, the Association's attorneys, also Messrs. Cohen, Shapiro, Polisher, Shiekman & Cohen, wrote to the Commissioner requesting a response as to the Department of Health's position on refunding the .53 percent assessments paid during the nine-month period from August 1992 through April 1993. The letter read:

On June 24, 1993, I sent a letter to then-Commissioner Bruce Siegel requesting a refund of .53% assessments paid by Deborah Heart & Lung Center from August of 1992 (the date after which the New Jersey Superior Court, Appellate Division, held the assessment to be illegal in *Barnert Memorial Hospital et al. v. Dunston*, A–541–91T1 (App.Div. April 30, 1993)) through April of 1993. (Copy enclosed.) Deborah was not an appellant in the *Barnert* case. I have not received a response to my June 24, 1993 letter.

In addition to representing Deborah, we represent a number of similarly situated hospitals that were not appellants in *Barnert*, but paid the illegal .53% amounts

between August of 1992 and April of 1993. Like Deborah, these hospitals seek refunds of the illegally paid amounts.

Please advise as to the Department's position on refunding illegally assessed amounts to my clients. If I do not hear from you by Monday, April 18, 1994, I will assume the Department's decision is to deny the requested refunds to the non-appellant hospitals. Thank you for your prompt attention to this matter.

Neither the Commissioner nor any other person from or representing the Department of Health responded to the April 13, 1994 letter. It appears from the record, however, that the Commissioner and his staff had indicated to the Association representatives and its attorneys that no voluntary refunds would be made to plaintiffs, and to date, none of the plaintiffs have received a refund of the .53 percent assessments overpaid during the nine-month period from August 1992 through April 1993.

On July 1, 1994, plaintiffs filed a verified complaint and supporting brief for an order to show cause and a declaratory judgment in the Law Division. Plaintiffs sought (1) a declaration that the overcollections were illegal in accordance with *N.J.S.A.* 26:2H–18.47 and the *Barnert* decision and (2) an order requiring the Commissioner to show cause as to why such overcollections should not be immediately refunded to them. The Commissioner denied that it was under any duty to make the refunds and by way of a counterclaim sought the compulsory payment from plaintiffs of .53 percent assessments due pursuant to *N.J.S.A.* 26:2H–18.62(c). Plaintiffs moved to dismiss the counterclaim, arguing that it would be more properly brought in the Appellate Division. The Commissioner filed a cross-motion for summary judgment. Following argument, the trial court held that plaintiffs' refund claims should have been raised by way of appeal under *R.* 2:2–3(b), and transferred the matter to this court pursuant to *R.* 1:13–4.

On appeal, plaintiffs seek a reversal of the final administrative action of the Commissioner and a refund of the excessive .53% assessments collected between August 1, 1992 and April 30, 1993. They contend that (1) the court in *Barnert* had already ruled that continued collection of 1991 .53% assessment beyond August 1992, was illegal; (2) they are entitled, at a minimum, to prospective

relief which includes the refund of all illegally collected monies retained by the Commissioner as of April 30, 1993; (3) they are entitled to retroactive relief under *Barnert;* and (4) they are entitled to the refunds because they paid the excessive .53% assessments under a mistake of fact and under duress. We disagree· and affirm.

## I.

The Commissioner contends that this action should have been dismissed rather than transferred to this court because it was time-barred. The Commissioner points to *R.* 2:4–1(b) which, in pertinent part, provides:

> Appeals from final decisions or actions of state administrative agencies or officers ... shall be taken within 45 days from the date of service of the decision or notice of the action taken.

The Commissioner's actions on August 14, 1991 commenced the running of the 45–day time limitation of *R.* 2:4–1(b). In letters dated August 14, 1991, addressed to the chief executive officers of plaintiff hospitals, former Commissioner Frances J. Dunston outlined that payments were to be made by each plaintiff hospital for a period of 24 months. The letters, in pertinent part, read:

> Section 25 of the Health Care Cost Reduction Act specifies that each Chapter 83 hospital shall pay 0.53% of its approved revenue base for 1991 to the Department of Health for deposit in the Health Care Cost Reduction Fund. Hospitals are to make monthly payments for a period of 24 months, with each payment equivalent to one-twelfth of 0.53% of each hospital's ·1991 approved revenue.

> In order to satisfy this obligation, please remit a check made payable to the State of New Jersey in the amount of ... (see attached). If you have any questions about how this amount was calculated, please contact Bob Bollaro at....

After receiving this letter, plaintiffs were on notice of the Commissioner's interpretation of the statute. Therefore, since they believed that they were only obligated to make twelve payments, they had a duty to challenge the Commissioner's interpretation. Plaintiffs, however, failed to take any action within the 45–day time period.

After the *Barnert* decision was handed down on April 30, 1993, plaintiffs were on notice of our construction of the statute and

were under a duty to challenge the payments which they were still making. Notwithstanding this knowledge, plaintiffs took no action against the Commissioner until they instituted this action more than one year later. Interestingly, plaintiffs did not join in the *Barnert* appeal, choosing instead to await the outcome of that case while the sixteen other hospitals expended their time, effort and money to challenge the assessments imposed by the Commissioner. Only after adjudication proved the assessments to be improperly calculated did these plaintiffs decide to institute suit. To allow suit to be brought now, would, in effect, be rewarding plaintiffs for sitting on their rights while this matter was adjudicated by others.

At the very latest, plaintiffs' time to appeal the Commissioner's actions commenced on April 18, 1994, the date that the Commissioner refused to grant plaintiffs' letter request for refunds. As previously mentioned, plaintiffs' attorneys specifically stated to Commissioner Fishman that: "[i]f I do not hear from you by Monday April 18, 1994, I will assume the Department's decision is to deny the requested refunds to the non-appellant hospitals." The Commissioner did not respond to this letter. As a result of their own ultimatum, plaintiffs were on notice as of April 18, 1994, that the Commissioner would not grant their request for the refunds. Thus, at the very latest, the 45–day period mandated by *R.* 2:4–1(b) within which they had to appeal commenced on April 18, 1994. Plaintiffs, however, chose not to bring this action until July 6, 1994, some seventy-nine days after April 18, 1994, the deadline set by them. Therefore, this action is time-barred.

## II.

Even if this action were not time-barred, plaintiffs would still not be entitled to a refund of the approximately $20 million in tax assessments paid to the State's HCCR Fund. "Public policy discourages suits for the refund of taxes erroneously paid or illegally collected." *Continental Trailways v. Director, Div. of Motor Vehicles,* 102 *N.J.* 526, 548, 509 *A.*2d 769 (1986), *cert.*

*dismissed,* 481 *U.S.* 1001, 107 *S.Ct.* 1636, 95 *L.Ed.*2d 195 (1987). It is firmly settled that "in the absence of statutory authority, taxes voluntarily, although erroneously, paid even under an unconstitutional statute cannot be refunded." *Ibid.* In *Continental Trailways,* however, the Supreme Court recognized that when a tax already collected is set aside by judicial decision, the law raises an assumption to refund the money which can no longer be honestly retained, but that under the "voluntary payment" exception to the rule, where a party, without mistake of fact, fraud, duress, or extortion, voluntarily pays money on a demand that is not enforceable against him, he may not recover it. *See Id.* at 549, 509 *A.*2d 769. *See also Squires Gate v. County of Monmouth,* 247 *N.J.Super.* 1, 588 *A.*2d 824 (App.Div.1991). The policy underpinnings of this rule have withstood the test of time, having been explained more than a century ago in *Riker v. Jersey City,* 38 *N.J.L.* 225, 225–26 (Sup.Ct.1876), where Chief Justice Beasley wrote:

... when money is demanded as a legal right, and it is paid without compulsion, and with a full comprehension of the facts, the money so paid cannot be reclaimed by a suit at law. The reason of this rule is, that the party paying had an opportunity to dispute the claim, and that having waived it at his own volition, it is impolitic to permit him to overhaul the transaction by an aggressive action. The doctrine is intended to be repressive of litigation, and it is promotive of the policy expressed in the maxim, *'Interest republicae ut sit finis litium.'*

[It concerns the state that there be an end of lawsuits.[1]]

More recently, the Court has noted that the voluntary payment rule is founded on the basic precept that, "[e]very man is supposed to know the law," from which it follows that, "[i]gnorance or mistake of law by one who voluntarily pays a tax illegally assessed furnishes no ground of recovery." *In re Fees of State Bd. of Dentistry,* 84 *N.J.* 582, 588, 423 *A.*2d 640 (1980). The Court has also pointed out that the rule gives recognition to the fact that "[g]overnment budgets are prepared on an annual cash basis," and that the State must, therefore, be able to rely on the presumptive validity of its statutes in planning its budget. *Continental Trail-*

---

[1] *Black's Law Dictionary* 730 (5th ed. 1979).

*ways, supra,* 102 *N.J.* at 548, 509 *A.*2d 769 (citing *Lavin v. Hackensack Bd. of Ed.,* 90 *N.J.* 145, 154, 447 *A.*2d 516 (1982)).

### A.

### *DURESS*

■■ Plaintiffs argue that "[t]he Commissioner wielded a great deal of power over hospital's reimbursement and financial well-being ...," which placed them under duress, and, therefore, the voluntary payment rule should not apply to bar this claim. We disagree. Any power which the Commissioner possessed over plaintiffs did not amount to duress.

> In order to constitute duress, it is sufficient and necessary that there be some actual or threatened exercise of power, possessed or believed to be possessed by the party exacting or receiving the payment, over the person or property of the person making the payment, from which the latter has no other available means of immediate relief than by submitting to the unreasonable or unjust demand and making the payment. No definite and exact rule of universal application can be laid down by which to determine whether a payment is voluntary or involuntary, but from the very nature of the subject, each case must depend somewhat on its own peculiar facts and circumstances.
>
> A payment made by the payor voluntarily and as a result of a deliberate choice of available alternatives cannot ordinarily be ascribed to duress.
>
> [70 *C.J.S. Payment* § 106 (1987).]

Plaintiffs did not act under duress, since all payments made to the Commissioner were voluntary, and there was no actual or threatened exercise of power by the Commissioner.

■ The decisive factor in the law of economic duress is the wrongfulness of the pressure exerted. *Continental Bank of Pa. v. Barclay Riding Acad.,* 93 *N.J.* 153, 177, 459 *A.*2d 1163, *cert. denied,* 464 *U.S.* 994, 104 *S.Ct.* 488, 78 *L.Ed.*2d 684 (1983). A party asserting duress can only succeed if he is able to show that he was subjected to a "wrongful threat precluding the exercise of ... free will." *Warnaco, Inc. v. Farkas,* 872 *F.*2d 539, 546 (2d Cir.1989). The Commissioner here exerted no pressure, let alone wrongful pressure, on plaintiffs. He simply made his calculations under the statute and apportioned liability to the hospitals accordingly. Since no pressure was exerted and plaintiffs made their

payments voluntarily and through the complete exercise of their own free will, the payments were not relinquished under duress.

■ Another factor that courts look to in determining the presence or absence of duress is timely protest. *See Continental Trailways, supra,* 102 *N.J.* at 549–50, 509 *A.*2d 769. Plaintiffs here failed to make any timely protest of the assessment in question despite their awareness of the *Barnert* appeal. Even after the *Barnert* decision was handed down, plaintiffs failed to take any legal action for more than a year and affirmatively chose to delay filing this action to advance their own tactical purposes. Their own attorneys' memorandum, dated May 17, 1994 and addressed to their chief financial officers, read:

> Those of you who have been making payments on the .53% assessment imposed pursuant to Chapter 160 (the assessment beginning in July of 1993) should stop making payments immediately. While we are still researching the best avenues for appeal of the Chapter 187 .53% assessment overpayments, we may determine that the best course of action will be to wait until the Department of Health pursues collection of the Chapter 160 .53% assessment. At that time, we may argue that the unpaid Chapter 160 assessments should be set off against the Chapter 187 overpayments.

The substance and tone of this memorandum thoroughly dispel any notion that plaintiffs were coerced by the Commissioner's "great powers," and makes clear that at all relevant times plaintiffs were free actors represented by counsel.

## B.

### MISTAKE OF FACT

■ Plaintiffs also argues that they made their payments under a mistake of fact, and, therefore, are entitled to a refund despite the voluntary payment rule. Plaintiffs argue that since they did not believe the HCCR Act was unconstitutional or invalid, and they trusted that the Commissioner had properly calculated the payments necessary under the Act, their mistake was one of fact, not of law. Again, we disagree.

> Generally, a mistake of fact, ... is such error or want of knowledge as to a fact, past or present, or such belief in the past or present existence as a fact of that which never existed, or such real and honest forgetfulness of a fact once known, as

that a true recollection or knowledge of the fact, or of its existence or nonexistence, would have caused the payor to refrain from making the payment.

[70 *C.J.S. Payment* § 115 (1987).]

\*  \*  \*  \*  \*  \*  \*  \*

A mistake of law is a mistake as to the legal consequences of an assumed state of facts, which occurs where a person is truly acquainted with the existence or nonexistence of facts, but is ignorant of, or comes to an erroneous conclusion as to, their legal effect. There is no payment under a mistake of law where the law is dependent on the facts and the facts are in dispute.

[70 *C.J.S. Payment* § 113 (1987).]

When plaintiffs made payments under the statute they were acting under a mistake of law. The payments were made under the Commissioner's belief that they were required by law, even though it was later determined by this court in *Barnert* that the full amounts collected were more than that permitted by law. The Commissioner's letter advising plaintiffs of the required payments could not have left them with any misapprehension of fact about how the statute had been interpreted. Plaintiffs were acting under the misapplication and misinterpretation of the statute by the Commissioner, which was simply a mistake of law.

In sum, based on the record, plaintiffs are barred from recovering the assessments under the voluntary payment rule. *See Continental Trailways, supra,* 102 *N.J.* at 550, 509 *A.*2d 769.

### III.

Finally, we hold that our decision in *Barnert* should not be given retroactive effect, entitling plaintiffs to the relief they now seek. Retroactive issues are generally determined under a three-part "equitable balancing test" that must be adapted "to fit the circumstances of each case." *County of Essex v. Waldman,* 244 *N.J.Super.* 647, 662, 666, 583 *A.*2d 384 (App.Div.1990), *certif. denied,* 126 *N.J.* 332, 598 *A.*2d 890 (1991). When a party seeks retroactive application of a decision against the State, important factors to be weighed are the extent to which the State has relied upon an invalidated law, and the extent to which giving retroactive effect to the decision will cause disruption of ongoing fiscal respon-

sibilities. *Salorio v. Glaser,* 93 *N.J.* 447, 464–65, 461 *A.*2d 1100 (1983), *cert. denied,* 464 *U.S.* 993, 104 *S.Ct.* 486, 78 *L.Ed.*2d 682 (1983).

In *Salorio,* the Supreme Court discussed the availability of prospective relief, stating:

> We are not unmindful of our broad discretionary power in the balancing of all hardships and equities in shaping an equitable decree. "Equity courts have often recognized matters of public policy, convenience of administration, and practicality as matters to be weighed in the scales along with the matters of justice and morality." Prospectivity illustrates the principle that equitable remedies "are distinguished by their flexibility, their unlimited variety, their adaptability to circumstances, and the natural rules which govern their use. There is in fact no limit to their variety and application; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties." Accordingly, prospectivity has been utilized to reach equitable results.
>
> [93 *N.J.* at 469, 461 *A.*2d 1100 (citation omitted).]

Here, if judgment were to be entered for plaintiffs, the State would be greatly burdened. The sum of overpayments totaled approximately $20 million, a huge sum of money to require the State to refund at this time. As the Court explained in *Salorio* regarding the emergency transportation tax payments made by New York-based commuters to the State of New Jersey:

> The legislative and the executive branches of government have relied on the ETT for many years in preparation of budgets, with respect to both income and expenditures, and in making appropriations and expenditures. The expenditures cannot be undone and reimbursement would have a substantial effect on the State's existing financial requirements. Public fiscal stability is at issue.
>
> [93 *N.J.* at 465, 461 *A.*2d 1100.]

As in *Salorio,* it would be inequitable to require the State to refund the payments made by plaintiffs. The money which remained in the HCCR Fund was transferred and deposited into the Health Care Subsidiary Fund. The Health Care Subsidiary Fund was instituted to provide services to medically needy segments of the population and included infant mortality reduction programs and community care programs for the elderly and disabled. In order to attain the necessary money to reimburse plaintiffs, the State would likely have to remove money from the Health Care Subsidiary Fund. Extracting that money could have the affect of

threatening the well-being of many of the individuals who now rely on the programs sustained by it. Further, if the money were to be extracted from a different State program, it could affect the existing financial requirements of the State. Consequently, we hold that under the circumstances, plaintiffs are not entitled to relief.

## IV.

Accordingly, the appeal from the final administrative action of the Commissioner which denied plaintiffs' request for a refund of the approximately $20 million in tax assessments paid to the State of New Jersey's HCCR Fund between August 1992 and April 1993 is dismissed with prejudice.