292 N.J. Super. 268 (1996)
678 A.2d 1101
COUNTY OF CAMDEN,[1] PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF MONMOUTH, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF ATLANTIC, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF MORRIS, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF UNION, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF HUDSON, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF SOMERSET, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF OCEAN, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF MERCER, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF SUSSEX, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF MIDDLESEX, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF ESSEX, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF PASSAIC, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT. COUNTY OF WARREN, PLAINTIFF-APPELLANT,
v.
WILLIAM WALDMAN, COMMISSIONER, NEW JERSEY DEPARTMENT OF HUMAN SERVICES, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued and Submitted May 30, 1996.
Decided July 15, 1996.
*270 Before Judges KING, KLEINER and HUMPHREYS.
Robert G. Millenky, Camden County Counsel, argued the cause for County of Camden (Mr. Millenky, on the joint brief filed by Camden, Monmouth and Atlantic Counties).
Gil D. Messina, Assistant County Counsel, argued the cause for County of Monmouth (Malcolm V. Carton, Monmouth County Counsel, attorney; Mr. Messina, on the joint brief filed by Camden, Monmouth and Atlantic Counties).
Carl A. Bergmann, Assistant County Counsel, argued the cause for County of Atlantic (Terry J. Dailey, Atlantic County Counsel, attorney; Mr. Bergmann, on the joint brief filed by Camden, Monmouth and Atlantic Counties).
W. Randall Bush, First Assistant County Counsel, argued the cause for County of Morris (Ronald Kevitz, Morris County Counsel, attorney; Mr. Bush, on the brief).
Kathleen M. Grant, Assistant Hudson County Counsel, argued the cause for Counties of Union and Hudson (Jacqueline R. Drakeford, Special Counsel, attorney for Union County, of counsel and on the joint brief filed by Union and Hudson Counties; Francis De Leonardis, Hudson County Counsel, attorney for Hudson County; Ms. Grant, on the joint brief).
Welaj, Miller & Robertson, attorneys for County of Somerset (Thomas C. Miller, on the brief).
Kevin B. Riordan argued the cause for County of Ocean (Berry, Kagan, Sahradnik & Kotzas, attorneys; Mr. Riordan, joins in the joint brief filed by Camden, Monmouth and Atlantic Counties).
*271 Angelo J. Onofri, Deputy County Counsel, argued the cause for County of Mercer (Alfred B. Vuocolo, Jr., Acting Mercer County Counsel, attorney; Sydney S. Souter, Deputy County Counsel, on the brief).
McConnell & Norton, attorneys for County of Sussex (John E. Ursin, on the brief).
Edward Testino, Assistant County Counsel, argued the cause for County of Middlesex (Bruce J. Kaplan, Middlesex County Counsel, attorney; Mr. Testino, on the brief).
Thomas M. Bachman, Assistant County Counsel, argued the cause for County of Essex (Catherine E. Tamasik, Essex County Counsel, attorney; Mr. Bachman, of counsel and on the brief).
Raymond P. Vivino, Passaic County Counsel, attorney for County of Passaic (Eugene G. Liss, Assistant County Counsel, joins in the briefs filed by Essex and Camden Counties).
David A. Wallace, Warren County Counsel, attorney for County of Warren (Mr. Wallace and Brett M. Reina, on the brief).
Kevin D. Sheehan argued the cause for intervenor County of Cape May (Serber, Konschak & Jaquett, attorneys).
Jaynee LaVecchia, Assistant Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General of New Jersey, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Daisy B. Barreto, Deputy Attorney General, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
This case involves claims by fourteen counties to a substantial portion of funds received by the State from the federal government as compensation for State and county payments to hospitals and institutions involved in the care of the medically indigent. Although the counties present attractive equitable arguments, the State Legislature has consistently appropriated the money to the General Fund in annual appropriations legislation and has refused *272 to share it with the counties. We conclude that we cannot, consistent with law, compel the State to share the federal funds with the counties.

I.
On February 2, 1993 the Federal Health Care Financing Administration (HCFA) approved an amendment to New Jersey's State Medicaid Plan, which resulted in payment to the State of approximately $412 million in Federal Financial Participation (FFP) Funds. The FFP funds were provided to the State pursuant to 42 C.F.R. § 447.250 to 257, and were related to disproportionate share hospital (DSH) payments made by the State between July 1, 1988 and December 31, 1991. These DSH payments were made to psychiatric hospitals and State facilities for the developmentally disabled which served a disproportionate number of indigent patients. The payments came from both the State and counties. The State placed the $412 million in the General Fund "as anticipated revenue."
Also at issue are FFP funds received in conjunction with DSH expenses incurred after December 31, 1991. The State received over $77 million for expenses incurred in the fiscal year ending June 30, 1992 and $163.3 million for each of the next two fiscal years (ending June 30, 1993 and June 30, 1994 respectively).[2] The amount of FFP funds in dispute is apparently in excess of $816 million.
Over a two-year period, the fourteen appellant counties (the Counties) wrote separately to William Waldman, Commissioner of the New Jersey Department of Human Services, asserting that a portion of the FFP funds should be distributed to them. The Commissioner determined that the Counties were not entitled to any of the FFP funds.
The Counties then filed complaints in lieu of prerogative writs in the Law Division, challenging the Commissioner's decision: Camden, August 11, 1993; Monmouth, December 7, 1993; Atlantic, *273 January 13, 1994; Hudson, January 14, 1994; Middlesex, March 3, 1994; Union, March 8, 1994; Ocean, May 13, 1994; Morris, May 25, 1994; Mercer, May 26, 1994; Sussex, July 22, 1994; Essex, October 17, 1994; Passaic, February 6, 1995; Warren, August 17, 1995. Somerset County made its initial filing in the Appellate Division.
On September 16, 1993 the State moved to transfer the Camden County action to the Appellate Division. The Law Division judge denied the motion. Leave to appeal was granted by this court and we ordered the case transferred to the Appellate Division. Similarly, the Atlantic and Monmouth County cases were transferred to the Appellate Division on February 3, 1994 and January 28, 1994, respectively. The Camden, Atlantic, and Monmouth County cases were consolidated on March 28, 1994. The remaining Counties' cases were also transferred to the Appellate Division: Union, April 20, 1994; Middlesex, May 4, 1994; Morris, May 25, 1994 (simultaneously with filing its Law Division Complaint); Hudson, July 1, 1994; Ocean, July 15, 1994; Mercer, July 26, 1994; Sussex, October 17, 1994; Essex, January 20, 1995; Warren, August 18, 1995; Passaic (date not in record).

II.

The State Statutory Scheme
Title 30, Chapter 4, which governs the management, control and operation of State institutions, provides a system of public assistance to individuals who are mentally ill or developmentally disabled when neither they nor their legally responsible relatives (LRRs) can afford the full cost of institutional care. The Commissioner of the Department of Human Services (Commissioner) has the general authority "to determine all matters relating to the unified and continuous development of the institutions and noninstitutional agencies within his jurisdiction." N.J.S.A. 30:1-12b. The Commissioner has the power to issue rules, regulations, orders and directions in order "to assure that programs that serve eligible low-income, handicapped, elderly, abused, and disabled persons are provided in an accessible, efficient, cost-effective and high-quality manner." N.J.S.A. 30:1-12a.
*274 Two types of institutions are within the Commissioner's jurisdiction: "psychiatric facilities" and "developmental centers." Psychiatric facilities, also known as "State hospitals for the mentally ill," and "mental hospitals," serve individuals with mental illness as defined in N.J.S.A. 30:4-27.2(r), N.J.S.A. 30:4-27.2(u), and N.J.S.A. 30:1-7. Developmental centers are residential institutions for persons with developmental disabilities as defined in N.J.S.A. 30:6D-25b (previously referred to as "mentally retarded"). Primary responsibility for maintaining an individual in a State psychiatric facility or State developmental disability center rests with that person and with LRRs. N.J.S.A. 30:4-66; N.J.S.A. 30:4-165.3. LRRs consist of "the husband, wife, father or mother of a child under 18 years of age, and the children, severally and respectively, being of sufficient ability," including spouses living separately and parents of illegitimate children who are confined. N.J.S.A. 30:4-66. If the individual and his LRRs are unable to pay, "then the cost of his care and maintenance shall be borne by [the county of legal settlement] from the beginning of his confinement...." N.J.S.A. 30:4-68. When an indigent patient is not legally settled in any county, the State is liable for the entire cost of the patient's care and maintenance. N.J.S.A. 30:4-69. County of legal settlement is defined by reference to N.J.S.A. 30:4-49.1 through  49.6. The rates charged to the Counties for the reasonable cost of maintenance and clothing for each indigent patient, whether in State or county psychiatric facilities or a State developmental-disability facility, are fixed by the State House Commission. N.J.S.A. 30:4-78.

Applicable State Law Before July 1, 1991.
Prior to July 1, 1991 N.J.S.A. 30:4-78 provided that the cost of psychiatric patients' maintenance, not covered by a patient or his LRRs, be borne equally by the State and the county of legal settlement. That statute provided:
The rate to be paid by the State to the several county institutions for the mentally ill on behalf of the maintenance of patients in county hospitals for the mentally ill shall be 1/2 of the actual per capita cost of maintenance of such patients in such county institution.

*275 The rate to be paid by the counties to the State in [sic] behalf of the maintenance of county patients in State hospitals for the mentally ill shall be 1/2 of the actual per capita cost of maintenance of such patients in such hospital.[3]
We note that the Counties' proportional obligation was set at the same 50%, whether the patient was being maintained in a county psychiatric facility, State psychiatric hospital, or other State facility.[4] If the committing judge determined, through application of certain financial-ability formulas, that a mentally ill patient with a county settlement or LRR was able to pay a sum equal to or in excess of the share chargeable to the county, the judge ordered the patient or LRR to pay that amount. N.J.S.A. 30:4-60.[5] If the amount contributed on the patient's behalf exceeded the County's 50% obligation, "no order shall be entered against the county of legal settlement for any part of such maintenance." Ibid. The State paid the remaining costs, if any. Ibid.

Applicable State Law, July 1, 1991 through September 30, 1995.
Effective July 1, 1991 N.J.S.A. 30:4-78 was twice amended[6] to provide, in pertinent part:

*276 [first five paragraphs omitted]
[¶ 1] The State share of payments to the several county psychiatric facilities on behalf of the reasonable cost of maintenance of patients shall be at the rate of 130% during the period July 1 through December 31 of each year and at the rate of 50% during the period January 1 through June 30 of each year; provided that the total amount to be paid by the State in each year shall not exceed 90% of the total reasonable per capita cost for the period January 1 through December 31 of each year.
[¶ 2] The rate to be paid by the counties to the State on behalf of the maintenance of county patients in State psychiatric facilities and State facilities and receiving [sic] other residential functional services for the developmentally disabled shall be 50% of the actual reasonable per capita cost of maintenance of such patients.
[¶ 3] During the period of July 1 through December 31 of each year, the State shall pay to each county an amount equal to 40% of the total per capita costs for the reasonable cost of maintenance and clothing of county patients in State psychiatric facilities for the period January 1 through December 31 of that year.
[¶ 4] During the period of July 1 through December 31 of each year, the State shall pay to each county an amount equal to 50% of the total per capita costs for the reasonable cost of maintenance and clothing of county patients residing in State facilities for the developmentally disabled and receiving other residential functional services for the developmentally disabled for the period January 1 through December 31 of that year.
[final paragraph omitted]
Prior to these 1990 and 1991 amendments, the type of facility the non-full-paying patient lived in did not affect a county's proportional share of costs under N.J.S.A. 30:4-78. After the amendments, however, a county was effectively responsible for 10% of costs at county psychiatric facilities[7] and State psychiatric facilities[8]; and none of the costs at State facilities for the developmentally *277 disabled.[9]
The 1991 amendments also added the following,
If the State shall directly receive funds, other than Medicare or Medicaid funds, in support of the patient, including but not limited to federal Social Security benefits, the State shall credit the funds to the county of settlement, but no credit shall exceed the county's share of the reasonable cost of maintenance and clothing costs for the patient.
N.J.S.A. 30:4-78 (emphasis added). The emphasized language parallels our decision in County of Essex v. Waldman, 244 N.J. Super. 647, 583 A.2d 384 (App.Div. 1990), certif. denied, 126 N.J. 332, 598 A.2d 890 (1991), which held that the State must turn over to the counties any federal Social Security benefits it receives as representative payee[10] for indigent patients in State institutions (up to the amount of the County's share of such patients' costs).[11]

*278 How the State Acquired the FFP Funds in Issue

The Medicaid program is a joint federal-state program of medical assistance established by Title XIX of the Social Security Act, 42 U.S.C. § 1396a to -§ 1396u. States are not required to participate in the Medicaid program but once they elect to enter the program they must comply with the federal Medicaid statute and regulations. Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784, reh. den., 448 U.S. 917, 101 S.Ct. 39, 65 L.Ed.2d 1180 (1980).
New Jersey, as a participating state, is required by federal law to submit a Medicaid State Plan (State Plan) describing the methods and standards by which providers of Medicaid services will be reimbursed. N.J.S.A. 30:4D-7(a); 42 U.S.C.A. § 1396a(a)(5); 42 C.F.R. §§ 400.203, 431.10(b), 447.252(b). If the State Plan is approved by the Secretary of the federal Department of Health and Human Services, the State is eligible for federal matching funds for amounts spent in accordance with the plan. 42 U.S.C.A. § 1396b. These matching funds are known as federal financial participation (FFP) funds. 42 C.F.R. § 400.203.
The State Plan must "take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs." 42 U.S.C.A. § 1396a(a)(13)(A). Such hospitals are known as disproportionate share hospitals (DSH), if they meet certain statutory requirements concerning the volume of indigent patients and expenditures. 42 U.S.C.A. § 1396r-4(a)(4). Payments made by the State and local governmental units to these hospitals may qualify as DSH payments, eligible for FFP matching funds. All federal matching funds are known as FFP, but the cases before us involve only FFP funds provided as reimbursement for DSH payments.
The New Jersey Department of Human Services (Department) disburses Medicaid payments to hospitals and other providers who render specific services to individual Medicaid recipients. In addition, the Department provides extra funding to those facilities which serve a large percentage of indigent patients. Pursuant to *279 N.J.S.A. 30:4-78, as discussed above, that extra funding comes from both the State and counties.
For several years, the State government pursued federal approval for a State Plan amendment which would allow the State to classify the cost-sharing payments made pursuant to N.J.S.A. 30:4-78 as DSH payments, enabling it to obtain FFP matching funds for those amounts. The approval was granted on February 2, 1993. These funds are the subject of the claims by the Counties.

III.
The Counties argue that County of Essex v. Waldman, 244 N.J. Super. 647, 583 A.2d 384 (App.Div. 1990), certif. denied, 126 N.J. 332, 598 A.2d 890 (1991) (Essex I), controls and entitles them to the lion's share of the FFP monies as a credit against their payments for patient care under the described statutory scheme.
Essex I addressed Essex County's challenge to the long-standing State practice of retaining 50% of Social Security benefits received by the State in its capacity as representative payee on behalf of indigent patients with Essex County settlements. For forty-five years, the State kept one-half of these Social Security benefits and credited the other one-half to the County's obligation for indigent-patient care. Essex County claimed that it was entitled to all of the Social Security benefits pursuant to N.J.S.A. 30:4-60, which provides that if the committing judge determines that the patient or the patient's LRRs are able to pay a sum equal to or in excess of the County's obligation as specified by N.J.S.A. 30:4-78, "no order shall be entered against the county of legal settlement for any part of such maintenance." N.J.S.A. 30:4-60. See Essex I, supra, 244 N.J. Super. at 653, 583 A.2d 384. We examined the legislative purpose behind N.J.S.A. 30:4-60 and stated:
To us, the language of N.J.S.A. 30:4-60 clearly manifests a legislative intention that that share of a patient's maintenance costs not covered by the State be paid for with funds supplied primarily by the patient's estate and secondarily by the *280 patient's legally-responsible relatives, if such funds are available. Only where those two sources are insufficient is the patient's county of legal settlement responsible for the patient's maintenance costs....
[Id. at 657-58, 583 A.2d 384.]
Next, we considered whether Social Security benefits could be considered part of the "patient's estate" and explained:
Most assuredly, the Act does not define the term "patient's estate." But by any sensible understanding Social Security benefits are the assets of the individual entitled to them ... and thus part of the patient's estate. We conclude that under N.J.S.A. 30:4-60, if a county-indigent patient receives Social Security benefits through a representative payee, those funds should first be paid over or credited to the county which then pays or credits the State the county's proper share of the patient's maintenance. The circumstance that benefits are received by a representative payee on behalf of the patient does not alter the fact that ultimately those monies are the property of the patient.
[Id. at 658, 583 A.2d 384.]
The statutory scheme, we explained, revealed "a legislative intent that the State bear ultimate financial responsibility in caring for indigent patients and that the Counties contribute to their own patients' costs only where those patients or their families cannot afford to do so." Id. at 660, 583 A.2d 384.
The Counties urge that Essex I propounds a rule that "[w]here there exists a third-party source of payment for the care of indigent psychiatric patients, that source must be tapped in a manner which reimburses counties for their statutory share of indigent care costs." Though this view is consistent with the Essex I holding, that case stands for a less general proposition. The Title 30 statutory scheme makes it clear that contributions from the patient's estate and from LRRs go first to defraying the County's share of expenses. In Essex I, we held that Social Security payments, "by any sensible understanding," were part of the patient's estate and should be credited to the County's share. Indeed, in Essex I, we relied on the fact that Social Security payments were ultimately "the property of the patient." Essex I, supra, 244 N.J. Super. at 658, 583 A.2d 384.
*281 Appellants here ask us to consider the FFP monies received as DSH payment reimbursement essentially as part of the estates of individual patients. This is a conceptual stretch.
In order to understand whether the FFP funds at issue can legitimately be regarded as part of the estates of those patients in State and County psychiatric hospitals, we must understand the nature of the DSH payments which those funds are designed to partially reimburse. "Regular" Medicaid payments made by the State to hospitals cover the reasonable costs of specific services provided to individual, Medicaid-eligible patients. Those individual patients must satisfy state and federal eligibility requirements. See N.J.S.A. 30:4D-6(e) and 42 U.S.C.A. § 1396d.
In addition to individual Medicaid and Medicare payments on behalf of the specific care provided specific individuals, and in addition to other patient-resources which fail to cover total costs, a state or county government may also provide extra money to some hospitals. These payments are the State's method of taking "into account the situation of hospitals which serve a disproportionate number of low income patients with special needs," as mandated by 42 U.S.C.A. § 1396a(a)(13)(A). In order to be termed DSH payments and to qualify for FFP funds, this extra money must be given to a facility which qualifies, under one of the federal law alternatives, as a disproportionate share hospital. A hospital can qualify as a DSH if it meets the requirements of U.S.C.A. § 1396r-4(b) and (d) or (e).
Though this funding is provided under the auspices of the Medicaid system, DSH payments are not "Medicaid payments" in the sense that they cover identifiable costs of individual patients. In this sense they are unlike the patients' Social Security payments in Essex I. Rather, DSH payments help to cover the extraordinary costs of those hospitals which serve a particularly high number of indigent patients, whether Medicaid- and Medicare-eligible or not, and they are tied to the State's obligation to consider the exceptional situation of those hospitals. Thus, DSH payments are designed to address the special financial plight of *282 the hospitals which serve a high volume of indigent patients; they are not addressed to the special financial plight of any individual patients.
The New Jersey Director of Medical Assistance and Health Services has defined DSH payments as they relate to 1) patient reimbursement by Medicaid, 2) hospital reimbursement by Medicaid, 3) cost of indigent patient care, and 4) cost of hospital operation:
a) Patient reimbursement by Medicaid
Disproportionate share payment adjustments are additional payments made to hospitals that are providing inpatient care to low-income patients (also called charity care). By definition, charity care is hospital care provided to individual patients who have no source of payment (including Medicaid), third-party insurance, or personal resources. Therefore, patient reimbursement by Medicaid is guided by the relevant provisions of Title XIX of the Social Security Act and the approved New Jersey Medicaid State Plan and is unaffected by disproportionate share payment adjustments. Nevertheless, actual disproportionate share payment adjustments could be made as an add-on to such patient per diem reimbursement rates.
b) Hospital reimbursement by Medicaid
Disproportionate share payment adjustments are payments made to hospitals over-and-above the normal payments to hospitals for inpatient care provided to Medicaid eligible patients....
d) Cost of hospital operations
The DSH payment adjustment amount applicable to a State and County hospital is calculated using the total cost of hospital operations as reported on the most recent Medicare/medicaid cost report for the hospital's reporting period ...
[Joint Select Committee on Medicaid Reimbursement: "To take testimony from invited individuals from the Department of Human Services regarding the application made by the Department for Medicaid uncompensated care retroactive claims, to July 1, 1988, for disproportionate share payments for State and county psychiatric hospitals", October 20, 1992, Memorandum and Attachment 1 by Saul M. Kilstein, Director of Medical Assistance and Health Services.]
The State of New Jersey ultimately succeeded in early 1993 in convincing the Federal Health Care Financing Agency (HCFA) that the cost-sharing payments made under N.J.S.A. 30:4-78 qualified as DSH payments for purposes of FFP reimbursement. Because New Jersey's cost-sharing payment scheme itself is based on unpaid per-patient costs, one is tempted to see the FFP funds in a similar light, namely, as reimbursement for half of the unpaid *283 per-patient costs of indigent patients in State and county psychiatric facilities. The Counties here so urge. However, the fact that the DSH payments may coincide with cost-sharing payments made pursuant to the costs of individual patients in this case is perhaps a matter of happenstance and may be misleading regarding the general nature of DSH payments under the federal scheme.
Somewhat tangentially, we observe that initially there was no limit to the amount of DSH payments for which a state could seek FFP reimbursement. Now, however, the total reimbursement is restricted and yearly increments are based on a state's permissible DSH payments made in the previous year. See 42 U.S.C.A. § 1396r-4(f), 42 C.F.R. §§ 447.296 to 299. The State notes that in a 1993 HCFA response to general comments regarding the proposed final rule limiting total DSH payments, one of the responses stated:
A few commenters were concerned with HCFA's assertion... that the interim final regulations will not have a direct or indirect affect on recipients since the rule will not preclude providers from receiving Medicaid payments for services that are furnished . ..
The response was:
The reference in the impact statement in the interim final rule to recipients was intended to mean individual Medicaid recipients. Since DSH payments are supplemental additional payments to hospitals not specifically tied to a specific Medicaid service provided to a specific Medicaid recipient, we concluded that the interim final DSH regulations would not directly or indirectly affect Medicaid services provided to individual Medicaid recipients.
[58 Fed.Reg. 43156, 43176 (1993).]
Though this regulatory response is less than particularly compelling evidence, the excerpt does support the State's notion that DSH payments are not payments which are made on behalf of individual patients or become in any way the property of particular patients.
The Counties also urge that the FFP payments here are truly third-party payments on behalf of the medically indigent patients. The Counties argue:
The fact that the FFP funds do not come to the State with specific patients' names attached to them should not stand as a bar to [the application of Essex I]. *284 The FFP funds represent the aggregation of the monies paid by the counties and the State[] in connection with specific patients ... as such, just as in the case of social security benefits received by the State as representative payee, the State must here be considered a mere conduit for the payment of funds on behalf of individuals.
The State responds that the FFP funds at issue in this case cannot be legitimately characterized as payments on behalf of individuals. These payments are designed to compensate the State for one-half of its DSH payments, which payments are neither targeted to individual indigent patients directly nor based on the specific care provided to those patients. Rather, DSH payments are designed to compensate the extraordinary costs incurred by those hospitals which serve a disproportionate number of indigent patients. Even though the hospitals' costs are incurred by providing services to individuals, it is the hospitals and not the individuals which are ultimately compensated by DSH monies.
The Counties rejoin that in the course of testimony before the State Legislature's Joint Select Committee on Medicaid Reimbursement on November 10, 1992, Richard Keevey, then-State Director of the Office of Management and Budget revealed the true original intent of the State when it applied for and eventually obtained FFP funds. In the course of his testimony before the Select Committee, Director Keevey had the following exchange with then-Treasurer Samuel Crane and then-Assemblywoman Harriet Derman, during which he acknowledged that the State's claim for FFP was made on behalf of the Counties and that the Counties should be entitled to their share when the State was paid:
ASSEMBLYWOMAN DERMAN: ... Nevertheless, I have questions. As a numbers man, you'll love them, I promise you. I have questions about the numbers. I totally don't understand them. In the Fiscal Year 1992 budget, it lists $850 million for the Governor's budget with respect to the item in question; [FFP for disproportionate share payments to] acute care [hospitals] $330 million; State retroactive [claim for the State and county psychiatric hospitals] [$] 380 [million]; and State terms [sic] [$] 140 [million].
TREASURER CRANE: Right.

*285 ASSEMBLYWOMAN DERMAN: Was there any particular methodology with respect to dividing the 380 and the 140?
TREASURER CRANE: The 380 was a retroactive claim prior to July 1, 1991. The 140, because we were still in the fiscal year, was the annual claim for Fiscal Year 1992, and the 330 was acute care. I think that covers the three.
ASSEMBLYWOMAN DERMAN: The annual claim, based on quarterly payments 
TREASURER CRANE: Correct.
ASSEMBLYWOMAN DERMAN: What were those quarterly payments? Did you assume then that they were all the same?
TREASURER CRANE: We assumed in the budget, I guess, about [$] 35 [million] 
MR. KEEVEY: Yes, 35.
TREASURER CRANE:  to the State a quarter.
ASSEMBLYWOMAN DERMAN: And yet when we look at the quarterly items for, let's say, the end of '91, the period ending March 31 is [$]37 [million]; June 30 is [$]37 [million]; September 30 is [$]41 [million]  they are going up  and December 30 is [$]41 [million]. They are not [$]35 million.
MR. KEEVEY: Some of that money has to do with filing for county reimbursement, which the State will not be able to include as its revenue. We were filing on behalf of the State and the county, because there 
ASSEMBLYWOMAN DERMAN: Could you elaborate on that, please?
MR. KEEVEY: Well, I don't know whether I can go into details  ...  but it has to do with  The State runs psychiatric hospitals; the counties run psychiatric hospitals. The reading of the law was that we were eligible for reimbursement for both levels of expenditures, because the State participates in county sharing of costs. We have a mental health State aid appropriation. The calculation that the Human Services Department did was on the basis on which we filed it. Part of it  the State difference between the $35 million and the $40-some million  is the fact that some of the money is county reimbursement.
ASSEMBLYWOMAN DERMAN: Would the State be able to retain it, or 
MR. KEEVEY: I think we would retain some of it, and some of it would go to the county.
ASSEMBLYWOMAN DERMAN: Would be transmitted to the county.
This dialogue favors the Counties' view of the matter. (For purposes of this decision, we conclude that the counties which operate county psychiatric hospitals, e.g., Essex and Mercer, are on the same footing as the other counties with respect to claims to the FFP funds. These county hospitals have already received their DSH payments from the State.)

*286 IV-(A).
We next turn to the Counties' alternative argument under the statutory scheme. The Counties also assert that they have a right to recover FFP funds under N.J.S.A. 30:4-68.1[12] and County of Essex v. Commissioner, New Jersey Dept. of Human Services, 252 N.J. Super. 1, 599 A.2d 167 (App.Div.), certif. denied, 127 N.J. 553, 606 A.2d 366 (1991) (Essex II). The Counties appear to argue either that 1) the State, in addition to withholding the FFP monies, has erroneously billed the Counties for patients currently eligible to receive Medicaid or Medicare payments or 2) N.J.S.A. 30:4-68.1 entitles the Counties to the FFP funds even if we hold that Essex I and N.J.S.A. 30:4-78 do not apply.
Apparently assuming that the Counties were making the first argument and, in essence, raising a concern totally unconnected to the FFP monies, the State has argued that this issue "has absolutely nothing to do with the Commissioner's determination concerning FFP and should not be considered part of this appeal." The State explains:
Appellants are not billed for Medicaid patients. However, there may be occasions when a patient does not become eligible for Medicaid until several months after treatment begins; in that case, the county would be credited for its expenses which relate to the date the patient is deemed eligible for Medicaid. The mechanics of Medicare payments are such that the counties may initially be billed for the services because it may not be known for months whether a person has Medicare coverage, but the State has a final reconciliation process whereby the counties are fully credited for the care of Medicare patients.
If the State is correct in its characterization of the Counties' argument, then it is likewise correct that the issue has not been properly raised administratively. There is no evidence in the record concerning Medicaid or Medicare eligibility, State billing practices, or county payments. In other words, there is no *287 allegation or supporting documentation that patient X became eligible for Medicaid on date Y and, nevertheless, the State continued to bill a county for that patient's care. To the extent this is the claim advanced by certain of the Counties, we remand this aspect of the cases to the Commissioner. The claim may be properly developed and presented on the remand.

IV-(B).
We believe, however, that the Counties actually are advancing a second statutory theory of entitlement to the FFP funds. The New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -35, sets out the criteria for medical assistance (Medicaid) eligibility. According to N.J.S.A. 30:4D-6(e):
Anything in this act to the contrary notwithstanding, no payments for medical assistance shall be made under this act with respect to care or services for any individual who:
(1) Is an inmate of a public institution (except as a patient in a medical institution); provided, however, that an individual who is otherwise eligible may continue to receive services for the month in which he becomes an inmate, should the commissioner determine to expand the scope of Medicaid eligibility to include such an individual subject to the limitations imposed by Federal Law and regulations, or
(2) Has not attained 65 years of age and who is a patient in an institution for mental diseases, or
(3) Is over 21 years of age and who is receiving inpatient psychiatric hospital services in a psychiatric facility; provided, however, that an individual who was receiving such services immediately prior to attaining age 21 may continue to receive such services until he reaches age 22. Nothing in this subsection shall prohibit the commissioner from extending medical assistance to all persons receiving inpatient psychiatric services provided that there is Federal financial participation available.

[emphasis added]
The Counties argue that "[t]he approval of Medicaid DSH payments for State psychiatric hospitals thus provides Medicaid coverage for those indigent psychiatric patients previously precluded because of their age." The Counties point to the highlighted language in N.J.S.A. 30:4D-6(e)(3) and assert:
The Federal approval of State Plan Amendment # 88-29C, was in essence an act by the Commissioner to extend medical assistance (Medicaid) to county indigent *288 patients in State psychiatric hospitals based on the availability of Federal financial participation.
Therefore, pursuant to N.J.S.A. 30:4-68.1, the counties are entitled to receive credits or refunds from the State for the counties' share of the maintenance costs for county indigent patients that were included in the FFP for Medicaid Disproportionate Share Hospital (DSH) payments.
Essentially, the Counties are advancing the argument that, because the FFP monies are Medicaid-related and are tied to the costs incurred by hospitals in treating individual patients, receipt of the FFP funds by the State transforms those patients into "Medicaid eligible" patients under N.J.S.A. 30:4-68.1. This section, as noted, provides, in pertinent part:
In the case of Medicaid and Medicare eligible patients residing in the State psychiatric facilities, the maintenance costs to be paid by the counties shall be satisfied by federal Medicaid or Medicare Part A payments to the State.
This argument by the Counties is not particularly persuasive because it turns the reasonable meaning of "Medicaid eligible" on its head. "Medicaid eligible" is generally intended to mean the eligibility of individual patients to direct Medicaid payments on their behalf. As discussed, DSH payments are not this type of individual funding, and the FFP payments at issue here, made as a share of DSH payments, are likewise general.
The statute states, "Nothing in this subsection shall prohibit the Commissioner from extending medical assistance to all persons receiving inpatient psychiatric services provided that there is [FFP] available." N.J.S.A. 30:4D-6(e)(3). This language likely refers only to those FFP funds which might become available on behalf of the individual patients and not to FFP payments made as a portion of DSH payments. Worth noting is the fact that 42 U.S.C.A. § 1396d(a) defines "medical assistance" as:
... payment of part or all of the cost of ... services ... for individuals ... who are 
(i) under the age of 21, or, at the option of the State, under the age of 20, 19, or 18 as the State may choose ...
(iii) 65 years of age or older.
This language parallels the requirements of N.J.S.A. 30:4D-6(e). A logical reading of the meaning of § 6(e) suggests that it aims to make psychiatric patients ineligible for Medicaid benefits as long *289 as they are ineligible to receive FFP funds towards their individual care. Even were we to assume that the FFP payments referred to in the State's statute were the type at issue in these cases, however, § 6(e)(3), by its plain language, merely gives the Commissioner the right to extend medical assistance to such patients. It does not mandate that extension.
The Counties imply that the receipt of the FFP payments was, essentially, a de facto extension of medical assistance to such patients. While there is a certain equitable appeal to this argument, what the Counties are really asking this court to do is to interpret "Medicaid eligible" in N.J.S.A. 30:4-68.1 to include those patients whom the Commissioner could, theoretically, make eligible but did not. This is a stretch of the statute and well beyond its ostensible meaning.
Some of the Counties assert that "[t]he Essex II holding is dispositive of the Consolidated Counties' claim to reimbursement of amounts charged by the State for the maintenance of Medicaid and Medicare eligible patients in State psychiatric facilities." Essex II, however, does not illuminate the issues before us in these cases. It does not interpret "Medicaid eligible" or address circumstances similar to the present cases. This court in Essex II simply looked at the pre-1991 version of N.J.S.A. 30:4-68.1 and held that it applied to patients in facilities for the developmentally disabled as well as to patients in psychiatric hospitals. Essex II, supra, 252 N.J. Super. at 10, 599 A.2d 167. In 1991, the Legislature amended § 68.1 to add the language "residing in the State psychiatric facilities." (N.J.S.A. 30:4-78, as amended in 1991, provided for 100% State payment for developmentally disabled patients.) If we interpret "Medicaid eligible" as the Counties would have us, Essex II would be helpful in determining the scope of reimbursement due the Counties under § 68.1 before its 1991 amendment. It is not helpful, however, in determining whether § 68.1 is otherwise applicable.
The Counties also argue that if their statutory entitlement argument does not prevail, the principle of unjust enrichment *290 warrants imposing a constructive trust on the State for the Counties' benefit. See Vasconi v. Guardian Life Ins. Co., 124 N.J. 338, 347, 590 A.2d 1161 (1991); Carr v. Carr, 120 N.J. 336, 352, 576 A.2d 872 (1990), aff'd after remand, 264 N.J. Super. 10, 623 A.2d 1384 (App.Div.), certif. denied, 134 N.J. 476, 634 A.2d 524 (1993).

V.
We conclude that the Counties do present attractive, if not compelling arguments, that our statutory scheme for financial responsibility for medically indigent patients requires reimbursement to them for their outlays on the patients' behalf. Undeniably, the payments by the Counties were used as part of the State's justification in applying for federal funds. But notwithstanding the basic fairness inherent in the Counties' claims, we are compelled to reject them because of the overriding principles explicated in City of Camden v. Byrne, 82 N.J. 133, 411 A.2d 462 (1980), and held applicable to the appropriations process.
The Appropriations Handbooks for Fiscal Years 1992-93, 1993, 1994-95, and 1995-96 state:
Additional federal Title XIX revenue generated from the claiming of uncompensated care payments made to disproportionate share hospitals shall be deposited in the General Fund as anticipated revenue. [1992-93 at B-138; 1993-94 at B-141; 1994-95 at B-110; 1995-96 at 108.]
In addition, the Appropriations Handbooks for 1994-95 and 1995-96 state:
Notwithstanding the provisions of any law to the contrary, all past, present and future revenues representing federal financial participation received by the State from the United States and that is based on payments made by the State to hospitals that serve a disproportionate share of low-income patients shall be deposited in the General Fund and may be expended only upon appropriation by law. [1994-95 at B-111; 1995-96 at B-108.]
The State argues quite convincingly that any legislative intent to reimburse the Counties from this "found" federal FFP money, which we might derive from interpreting the statutory scheme of Title 30, has been effectively suspended by the several appropriations processes and acts since 1993. By the specific language in *291 the respective appropriations acts, the politically responsible branches of government have chosen to divert these substantial FFP funds to the General Fund and not to reimburse the Counties for their contributions to the care of the medically indigent.
The Counties are here challenging the Legislature's decision, with the Governor's acquiescence, not to appropriate these federal funds for their use. By seeking to have us exercise judicial power over legislative expenditures, the Counties urge our intervention in an essentially political dispute. The Legislature has decided to treat this politically sensitive matter periodically and flexibly on an annual basis through the appropriations process. Though we may question the fairness of the decision, we cannot change it. The relief sought by the Counties calls for impermissible judicial intrusion into the exercise of the appropriation power, a violation of the separation of powers doctrine. N.J. Const. (1947), Art. III, par. 1. The now-$800 million plus has been placed in the General Fund. There was no federal mandate that this reimbursement money be used for any particular purpose. No federal strings were attached.
The scope and efficacy of the appropriations power was treated extensively in City of Camden v. Byrne, 82 N.J. 133, 411 A.2d 462 (1980), where several municipalities and counties brought actions against various State officials, including the Governor, to have certain State revenues appropriated for their use. The suits failed. The Supreme Court firmly concluded: "New Jersey courts have consistently adhered to the principle that the power and authority to appropriate funds lie solely and exclusively with the legislative branch of government." Id. at 148, 411 A.2d 462. There is no judicial redress from the exercise of that constitutional power. Id. at 149, 411 A.2d 462. Annual appropriation acts which intentionally omit expenditures called for by previous laws actually "suspended, supplanted or repealed," id. at 152, 411 A.2d 462, prior laws which had purported to grant fiscal entitlement.
The Court explained the reasoning by which the appropriations act trumps standard statutory expenditures:

*292 It should be emphasized that in considering the applicability of the general doctrine of implied repealer, we are here concerned with the impact upon existing statutes of special or unique legislation, namely a general appropriation law. The appropriation law has a life limited to its fiscal year. Hence, at most, its effect upon inconsistent enactments could endure only for as long as it itself endures. It is therefore more accurate to discuss such an effect in terms of implied suspension rather than implied repeal. [Ibid., emphasis supplied.]
The Court's analysis continued, emphasizing that the judiciary cannot, from a wellspring of good intentions, constitutionally override such conscious appropriations legislation.
In this case, the legislative failure to appropriate funds to effectuate these several statutes was an intentional and advertent act. In several instances, the Governor disregarded past practice and refused to include these items in his budget message; in others, he exercised his line-item veto power to excise these from the appropriation act. The Legislature did not reenact these itemized appropriations by overriding the Governor's vetoes. Hence, the failure to appropriate on the part of the Legislature cannot be ascribed to indifference, coincidence, or accident.
It follows that such a definite legislative intent as reflected in the general appropriation laws necessarily supersedes any previously expressed legislative desires at least for the duration of the particular appropriation act. The earlier statutes cannot coexist with the enacted appropriation and, consequently, must be deemed to be suspended by adoption of the later appropriation acts.
[Id. at 154, 411 A.2d 462.]
The Court concluded that "the Legislature itself has expressed its intent with sufficient clarity to render it singularly inappropriate for this Court to give any legal effect whatsoever to the earlier statutory enactments." Id. at 155, 411 A.2d 462. See also Karcher v. Kean, 97 N.J. 483, 488, 479 A.2d 403 (1984). Moreover, "the county is a creature of the State. Its existence and powers depend upon the Legislature's determinations. It is subject to the dominion of the Legislature." Clark v. Degnan, 83 N.J. 393, 400, 416 A.2d 816 (1980).
Our constitutional scheme consigns the resolution of the struggle for a share of this largesse from the federal government to the political, rather than the judicial, arena.[13] Despite any inclination *293 we may have to impose an equitable remedy or to construe Title 30 to require appropriate payments out of the FFP funds to the Counties, we refrain and affirm the Commissioner, with the exception of the remand discussed in IV-(A).
Affirmed in part; remanded in part.
NOTES
[1] These appeals have been consolidated for purposes of opinion.
[2] The Counties do not cite to the record in support of these figures; however, the State concedes that "[t]he State continues to receive FFP for DSH payments made after December 1991."
[3] N.J.S.A. 30:4-165.3 did not provide any ratio for sharing the cost of maintaining patients in State developmental-disability facilities; rather, the statute made the patient, LRRs, State and county of legal settlement responsible for all costs. In practice, however, the State allocated responsibility for costs of maintenance at developmental-disability institutions on the same 50/50 basis as costs incurred at State and county psychiatric hospitals. County of Essex v. Waldman, 244 N.J. Super. 647, 652-53 n. 2, 583 A.2d 384 (App.Div. 1990), certif. denied, 126 N.J. 332, 598 A.2d 890 (1991).
[4] As to the Counties' obligation to pay for costs incurred at State facilities for the developmentally disabled, see n. 3 supra.
[5] N.J.S.A. 30:4-60 was twice amended, effective July 1, 1991, L. 1990, c. 73, § 2, and effective December 27, 1995, L. 1995, c. 155, § 14, but the changes are not relevant to the issues on appeal.
[6] L. 1990, c. 73, § 4; L. 1991, c. 63, § 15. According to the Assembly County Government Committee Statement to the original bill, dated June 14, 1990, "The intent of the bill is to provides [sic] property tax relief to taxpayers by requiring the counties to reduce their budgets commensurate with the increased State assistance."
[7] Under ¶ 1, the State pays 130% of costs incurred during the first half of the fiscal year and 50% of costs incurred during the second. That yields an average State share of 90%, leaving the county with the remaining 10%.
[8] ¶ 2 holds the county responsible for 50% of costs incurred in State psychiatric facilities, but ¶ 3 requires the State to pay the county 40% of those total costs. That leaves the county responsible, in effect, for 10% of costs at State psychiatric facilities.
[9] ¶ 2 holds the county responsible for 50% of costs incurred at State facilities for the developmentally disabled, but ¶ 4 requires the State to pay the county the same 50%. In effect, the county ends up paying none of the costs incurred at developmental-disability facilities.
[10] Federal regulations provide that a county may not serve as representative payee for patients in State institutions. 20 C.F.R. § 404.2001; 20 C.F.R. § 416.601. We surmise that the State does not serve as representative payee for patients in county institutions.
[11] Applicable State Law since June 30, 1995. Effective June 30, 1995 N.J.S.A. 30:4-78 was amended to provide, in pertinent part: "Any amount received from a person or persons for the maintenance of a patient in a county psychiatric facility shall be shared between the county and the State in the same ratio as the reasonable cost of maintenance and clothing are the responsibility of the State and county for the corresponding service period." The 1995 amendment provides for a similar State/County split of monies received for the maintenance of patients in State psychiatric facilities. Thus the State is now entitled to 90% of money received on behalf of patients in County or State facilities, and the County is entitled to 10%.

The import of this amendment is that even if the Counties are entitled to part of FFP payments made to the State, they are entitled to only 10% of FFP payments made on or after July 1, 1995. Since the FFP payments equal half the combined State/County expenditures for indigent psychiatric patients, the County's 10% share of the FFP payment would reimburse it for only about half of its statutory share.
[12] N.J.S.A. 30:4-68.1 provides, in pertinent part:

In the case of Medicaid and Medicare eligible patients residing in the State psychiatric facilities, the maintenance costs to be paid by the counties shall be satisfied by federal Medicaid or Medicare Part A payments to the State. [There is no law which discusses this subsection in any context.]
[13] Assembly Bill No. 2323, introduced February 23, 1993 and Assembly Bill No. 578, prefiled for introduction in the 1994 Session, evince such political activity. Both bills, which countenanced credits to the counties for the FFP payments, failed to emerge from committee. We draw no inference from either their substance or their demise, other than the fair conclusion that the subject is a suitable one for political rather than judicial resolution.